O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WYATT TECHNOLOGY CORPORATION, a California corporation,

              Plaintiff,

   v.

MALVERN INSTRUMENTS INCORPORATION, a Massachusetts corporation; DAVID DOLAK, an individual,

             Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. CV 07-08298 DDP (MANx)

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS FOR PARTIAL SUMMARY JUDGMENT ON COPYRIGHT AND NON-COPYRIGHT CLAIMS**

[Motions filed on June 29, 2009]

Before the Court are two Motions for Partial Summary Judgment filed by Defendants Malvern Instruments Inc. and David Dolak.  In the first Motion, Defendants move for partial summary judgment on Plaintiff's copyright claims.  In the second Motion, Defendants move for summary judgment on Plaintiff's non-copyright claims, i.e., those for misappropriation of trade secrets, Lanham Act damages, intentional interference with prospective economic advantage, unfair competition, and accounting.  Plaintiff Wyatt

1  Technology Corporation opposes both motions.[1]  On the Friday

2  afternoon before the hearing on these motions, Plaintiff also filed

3  a Rule 56(f) request.  After reviewing the materials submitted by

4  the parties, hearing oral argument, and considering the evidence in

5  detail, the Court denies the Rule 56(f) request as untimely and

6  grants in part and denies in part the Motions for Summary Judgment

7  for the reasons discussed below.

8  **I.    BACKGROUND**

9      **A.    Factual Background[2]**

10     Plaintiff Wyatt Technologies Corporation ("Wyatt" or

11  "Plaintiff") and Defendant Malvern Instruments Incorporated

12  ("Malvern") are competitors in the particle analysis field.  Second

13  Amended Complaint ("SAC") ¶ 64.  Both manufacture, market, and/or

14  sell laser light scattering goods and services relating to

15  measuring molecular weights and characterization of molecules and

16  particles.  Id.  The technology is called dynamic light scattering

17  ("DLS").  Plaintiff markets and sells a DLS instrument called a

18  "DynaPro."  SAC ¶ 28.  Malvern sells a DLS insrument called the

19  Zetasizer Nano.  Id. ¶ 64.

20

21

---

22  [1]Plaintiff filed its oppositions late.  In their Reply briefs,
23  Defendants request that the Court exercise its discretion under
   Local Rule 7-12 to decline consideration of these untimely papers
24  and deem the failure to timely oppose the motion plaintiff's
   consent to the granting of the motions.  See Copyright Reply at 1
25  n.1; Non-Copyright Reply at 1 n.1.  In light of the principle
   favoring adjudication on the merits, the Court will not disregard
26  Plaintiff's papers.  The Court notes that Defendants did not
   request that the Court continue the hearing date either by motion
27  or upon inquiry by the Court.

28  [2]Except where noted, the following facts are undisputed for
   the purposes of this motion.

2

In November 2004, Plaintiff acquired certain physical and intangible assets of Proterion Corporation through an Asset Purchase Agreement ("APA").  Proterion Corporation's wholly-owned subsidiary Protein Solutions provided technology to the biomolecular research community.  One product of Protein Solutions was the DynaPro DLS Instrument.  Among the assets Plaintiff acquired were the DynaPro product line and physical assets, the website domain, software code, customer databases, manufacturing software programs and databases and related documents, and patents.

Beginning in October 2007, Plaintiff registered certain copyrights related to those assets.  Those copyright registrations included registrations for: (1) a software program entitled "DYNAMICS v.6.2.05"; (2) a software program entitled "DYNAMICS v.6.3.40"; (3) a software program entitled "DYNAMICS v.5.26.56"; (4) an installation CD entitled "DYNAMIC INSTALLATION CD v.6.3.40"; (5) an installation CD entitled "DYNAMICS INSTALLATION CD v.5.26.56"; (6) text and graphs entitled "PSI Books, Dynamic Light Scattering"; (7) text and graphs constituting the "Protein Solutions" web site; (8) text titled "PSI Books"; and (9) text titled "PSI Frequently Asked Questions."

In January 2003, Malvern hired Defendant David Dolak ("Dolak"), a former Protein Solutions employee.  Malvern hired Dr. Kevin Mattison, a former Protein Solutions employee, in 2002.  It is undisputed Malvern additionally hired Dr. Ulf Nobbman, also a former Protein Solutions employee, though the parties dispute when Dr. Nobbman began working with Malvern.  See Non-Copyright SGI ¶ 7. Dolak was employed by Protein Solutions as its Marketing and Sales Manager for over five years prior to being hired by Malvern.

1  According to Plaintiff, Dolak signed a confidentiality agreement

2  and breached his obligations under that agreement by conveying

3  confidential information to Malvern and third parties.

4      According to Plaintiff, through the manufacture, marketing,

5  and sale of the Zetasizer Nano, Malvern and Dolak have infringed

6  Plaintiff's copyrights.  See SAC ¶ 49.  Additionally, Plaintiff

7  claims that Malvern has used false advertising and misappropriation

8  of Plaintiff's trade secrets to acquire a position in the market.

9      **B.  Procedural History**

10     Plaintiff filed this suit on December 21, 2007, and filed its

11 SAC, the governing pleading, on April 14, 2008.[3]  The SAC seeks to

12 bring fourteen causes of action against Defendants Malvern and

13 Dolak (collectively, "Defendants"): (1) nine claims for copyright

14 infringement (U.S. Copyright Nos. TXu 1-569-097, TXu 1-569-098, TXu

15 1-569-099, TX 6-812-045, TX 6-812-047, TX 6-812-053, TX 6-813-868,

16 TX 6-813-833, and TX 6-816-834); (2) false advertising in violation

17 of the Lanham Act; (3) misappropriation of trade secrets in

18 violation of California Civil Code §3425.1(b); (4) tortious

19 interference with prospective business advantage in violation of

20 California law; (5) unfair competition under California law; and

21 (6) accounting.

22

23

24

25

26 ────────────────

27     [3]Plaintiff incorrectly filed its Second Amended Complaint on
   April 14, 2008.  See Dkt. No. 25.  That document was stricken as
28 incorrectly filed, see Dkt. No. 27, and re-filed on April 17, 2008.
   Dkt. No. 28.

1   Defendants now bring two motions for partial summary judgment:
2   one on Plaintiff's copyright claims, and one on Plaintiff's non-
3   copyright claims.[4]

4   **II.   PROCEDURAL STANDARD - SUMMARY JUDGMENT**

5   Summary judgment is appropriate where "the pleadings, the
6   discovery and disclosure materials on file, and any affidavits show
7   that there is no genuine issue as to any material fact and that the
8   movant is entitled to a judgment as a matter of law."
9   Fed. R. Civ. P. 56(c).  All reasonable inferences from the evidence
10  must be drawn in favor of the nonmoving party.  Anderson v. Liberty
11  Lobby, Inc., 477 U.S. 242, 255 (1986).  A genuine issue exists if
12  "the evidence is such that a reasonable jury could return a verdict
13  for the nonmoving party"; and material facts are those "that might
14  affect the outcome of the suit under the governing law."  Anderson,
15  477 U.S. at 248.  A party opposing summary judgment must come
16  forward with specific facts, supported by admissible evidence,
17  showing a genuine issue for trial.  Fed. R. Civ. P. 56(e); Brinson
18  v. Linda Rose Joint Venture, 53 F.3d 1044, 1049 (9th Cir. 1995).

19  **III. PLAINTIFF'S RULE 56(f) REQUEST**

20  In the afternoon of the Friday before the Monday morning
21  hearing on Defendants' Motions for Summary Judgment, Plaintiff
22  submitted a document titled "Declaration of Frank Frisenda in

23

24      [4]In this Order, the Court uses the following abbreviations
25  when citing to the briefs and related papers: (1) for the copyright
    briefs, the Court refers to "Copyright [Mot., Opp'n, Reply]"; (2)
26  for the non-copyright briefs, the Court refers to "Non-Copyright
    [Mot., Opp'n, Reply]"; (3) for Defendants' statements of undisputed
27  fact, the Court refers to "Copyright SUF," "Copyright Reply SUF,"
    "Non-Copyright SUF," or "Non-Copyright Reply SUF"; and (4) for
28  Plaintiff's statements of genuine issues, the Court refers to
    "Copyright SGI" and "Non-Copyright SGI."

1   Support of Request for Denial or Continuance of Summary Judgment
2   under FRCP 56(f)."  See Dkt. No. 161 (July 24, 2009).  Pursuant to
3   Rule 56(f), a court may deny a summary judgment motion or order a
4   continuance "[i]f a party opposing the motion shows by affidavit
5   that, for specified reasons, it cannot present facts essential to
6   justify its opposition."  Fed. R. Civ. P. 56(f).

7        In addition to for the reasons identified by Defendants, see
8   Defs.' Opposition to Plaintiff's Request (Dkt. No. 162) (July 27,
9   2009) (noting, among other points, that Plaintiff does not explain
10  which of the various summary judgment grounds may be defeated by
11  information to be obtained through the limited remaining
12  discovery), the Court denies this request as untimely.  Although
13  the Court granted Plaintiff's request to reopen discovery a full
14  week prior to the time Plaintiff's Oppositions were due – and over
15  a week before Plaintiff filed its Oppositions – Plaintiff wholly
16  failed to request a Rule 56(f) continuance until the Friday
17  *afternoon* prior to the hearing on the Motions.  Prior to that
18  point, at no point in the voluminous materials submitted to the
19  Court did Plaintiff suggest that more information was necessary or
20  would be helpful.  The Court denies Plaintiff's Rule 56(f) request
21  as untimely.

22  **III. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AS TO PLAINTIFF'S**
23       **COPYRIGHT CLAIMS**

24       Defendants first move for summary judgment on Plaintiff's
25  copyright claims.  With respect to claims 1 through 5 and claim 7,
26  Defendants argue that the Court should grant summary judgment in
27  their favor because Malvern's software (claims 1 through 5) and
28  website (claim 7) are not substantially similar to any protected

1  elements of Plaintiff's work.[5]  With respect to claims 6 and 8,

2  Defendants argue that the Court should grant summary judgment in

3  their favor because the copyrights in the works have been

4  abandoned.  With respect to claim 9, Defendants argue that

5  Plaintiff has no evidence of actual damages and is not entitled to

6  statutory damages or attorneys' fees.  Additionally, Dolak argues

7  that he is not individually liable with respect to claims 1 through

8  8.  Finally, Defendants argue that Plaintiff cannot get statutory

9  damages or attorneys' fees as to any of its copyright claims.

10      **A.  Legal Framework**

11          1.  <u>Copyright Infringement Analysis</u>

12      In order to succeed on a claim for copyright infringement, a

13  plaintiff must show that it owns the copyright and that the

14  defendant copied protected elements of the work.  <u>Jada Toys, Inc.</u>

15  <u>v. Mattel, Inc.</u>, 518 F.3d 628, 636 (9th Cir. 2008)(quoting <u>Cavalier</u>

16  <u>v. Random House, Inc.</u>, 297 F.3d 815, 822 (9th Cir. 2002)).  A

17  plaintiff may prove copying through circumstantial evidence that

18  establishes (1) the defendant had access to the copyrighted work

19  and (2) the protected portions of the works are substantially

20  similar.  <u>Id.</u> at 636-37.  The issue of substantial similarity can

21  be amenable to summary judgment if "no reasonable juror could find

22  substantial similarity of ideas and expression."  <u>Funky Films, Inc.</u>

23

24

_____

25      [5]Defendants seek partial summary judgment with respect to
26  Claims 1 through 3.  Defendants note that Wyatt claims Defendants
    have infringed Plaintiff's source code and screen displays.
27  Defendants move for summary judgment on the screen display issue
    only.  Defendants move for summary judgment on Claims 4, 5, and 7
28  in their entirety.  <u>See</u> Copyright MSJ at 4 n.1; Copyright MSJ Reply
    at 6 n.5.

1  <u>v. Time Warner Entm't Co., L.P.</u>, 462 F.3d 1072, 1076 (9th Cir.
2  2006).

3       The Ninth Circuit uses a two-part test – an extrinsic test and
4  an intrinsic test – to determine whether two works are
5  substantially similar.  <u>Jada Toys, Inc.</u>, 518 F.3d at 637.  While
6  the extrinsic test considers whether there are substantial
7  similarities in both ideas and expression, the intrinsic test
8  measures expression subjectively, from the standpoint of the
9  ordinary reasonable observer.  <u>Apple Computer, Inc. v. Microsoft</u>
10 <u>Corp.</u>, 35 F.3d 1435, 1442 (9th Cir. 1994).  On summary judgment,
11 courts look only to the extrinsic test.  When applying the
12 extrinsic test, "a court must filter out and disregard the non-
13 protectable elements in making its substantial similarity
14 determination."  <u>Cavalier</u>, 297 F.3d at 822.  Put differently, in
15 the extrinsic test, the court uses "analytic dissection to
16 determine the scope of copyright protection before works are
17 considered as a whole."  <u>Apple Computer, Inc.</u>, 35 F.3d at 1443.

18      In <u>Apple Computer</u>, the Ninth Circuit identified three steps as
19 "helpful" to follow in performing the substantial similarity
20 analysis.  <u>Id.</u>  First, the plaintiff must identify the sources of
21 the alleged similarity between its work and the defendant's work.
22 <u>Id.</u>

23      Second, using "analytic dissection," the court must determine
24 "whether any of the allegedly similar features are protected by
25 copyright."  In so doing, the Court must separate ideas from
26 potentially protectable expression.  <u>Id.</u>  "[T]o that expression,
27 the court must then apply the relevant limiting doctrines in the
28 context of particular medium involved."  <u>Id.</u>  Analytic dissection

1  is appropriate because the party claiming infringement may place no
2  reliance upon similarity in expression resulting from unprotectable
3  elements.  Id. at 1446.  Instead, "the unprotectable elements have
4  to be identified, or filtered, before the works can be considered
5  as a whole."  Id.  Limiting doctrines that bear on the amount of
6  protection of the work include the merger doctrine, the constraints
7  of the medium that limit the options for expression, and
8  originality.  Id. at 1444-45.  Pursuant to the merger doctrine,
9  when an idea and its expression are indistinguishable, the
10 expression will only be protected against nearly identical copying.
11 Id. at 1444.  In the copyright context, "originality" is defined as
12 material created by the author.

13     Third, the Court "must define the scope of the plaintiff's
14 copyright-that is, decide whether the work is entitled to 'broad'
15 or 'thin' protection."  Id. at 1443.  Depending on the degree of
16 protection, the court must set the appropriate standard for a
17 subjective comparison of the works to determine whether, as a
18 whole, they are sufficiently similar to support a finding of
19 illicit copying.  Id. at 1443.  A work afforded broad protection is
20 then compared as a whole with the allegedly infringing design to
21 determine if the two are substantially similar.  Computer Access
22 Tech. Corp. v. Catalyst Enters., Inc., 2001 WL 34118030, *14 (N.D.
23 Cal. June 13, 2001) (Jenkins, J.).  On the other hand, a work
24 afforded thin protection is compared as a whole with the allegedly
25 infringing design to determine if the two are "virtually
26 identical."  Id. (citing Apple Computer, 35 F.3d at 1446-47).

27         2.   Software and Copyright

28

9

1    These rules apply equally to software, <u>Apple Computer</u>, 35 F.3d
2   at 1445 ("[G]raphical user interface audiovisual works are subject
3   to the same process of analytical dissection as are other works."),
4   though software tends to enjoy more limited copyright protection
5   because of its functional nature.  As <u>Apple Computer</u> suggests, "not
6   all copyrighted works are entitled to the same level of
7   protection": "[t]o the extent that a work is functional or factual
8   it may be copied, as may those expressive elements of the work that
9   must necessarily be used as incident to expression of the
10  underlying ideas, functional concepts, or facts."  <u>Sega Enters.</u>
11  <u>Ltd. v. Accolade, Inc.</u>, 977 F.2d 1510, 1524 (9th Cir.
12  1992)(internal citation and quotation marks omitted).  As a general
13  rule, copyright protection does not apply to any "idea, procedure,
14  process, system, method of operations . . . regardless of the form
15  in which it is described, explained, illustrated, or embodied in
16  such work."  17 U.S.C. § 102(b).  Because computer programs can
17  have creative elements but are also fundamentally functional,
18  software tends to enjoy relatively weak protection and is subjected
19  to a high standard for similarity before there will be
20  infringement.  <u>Id.</u> at 1524-26; <u>see</u> <u>Sony</u>, 203 F.3d at 603; <u>Apple</u>
21  <u>Computer</u>, 35 F.3d at 1446 (computer programs entitled to "thin"
22  protection).

23     For example, a plaintiff is not entitled to copyright
24  protection for features such as calculators and other methods of
25  operation.  17 U.S.C. § 102(b); <u>see also</u> <u>Calyx Technologies, Inc.</u>
26  <u>v. Ellie Mae, Inc.</u>, 2005 WL 2036918, *3 (N.D. Cal. August 22, 2005)
27
28

1   (Illston, J.).[6]  Similarly, common methods for organizing and

2   depicting data are generally not protected.  See Computer Access,

3   2001 WL 34118030 at *15.  Moreover, to the extent the screen

4   display merely includes a "blank form," the material is not

5   entitled to protection.  37 C.F.R. § 202.1(c);  Bibbero Sys., Inc.

6   v. Colwell Sys., Inc., 893 F.2d 1104, 1107 (9th Cir. 1990).  Under

7   Bibbero, "the blank forms rule denies copyrightability to forms

8   consisting entirely of spaces for the recording of information,

9   whether labeled or unlabeled, that are not accompanied by text

10  conveying information, such as instructions regarding the use of

11  forms."  Advanz Behavioral Mgmt. Res., Inc. v. Miraflor, 21 F.

12  Supp. 2d 1179, 1189 (C.D. Cal. 1998).

13      **B.   Claims 1 through 5**

14      With respect to the SAC's First through Fifth Claims,

15  Defendants argue that there is no substantial similarity between

16  the various Malvern works and the Wyatt works.  In particular,

17  Defendants focus on a lack of substantial similarity between

18  protected elements because of the largely unprotected nature of

19  much of the work.[7]  Plaintiff's Opposition includes nearly no

20  explanation; while some of Plaintiff's evidence supports access

21  (which Defendants do not contest in this motion), almost none of it

22  addresses substantial similarity, and Plaintiff provides no

23

24      [6]Although the order in Calyx appears to have been vacated
    pursuant to a settlement by the parties, the Court finds that
25  decision well-reasoned on this legal point.

26      [7]The Court notes that Plaintiff spends a portion of its brief
    discussing its copyright arguments in the context of installation
27  and loading into RAM.  See Copyright Opp'n at 18-20.  As far as the
    Court can tell, this argument is irrelevant to Plaintiff's claims
28  or evidence.  Reply at 3:23-4:11.

1  analysis connecting the evidence.  The Court considers only the

2  screen display basis for copyright infringement, not any source

3  code similarities.[8]

4       1.  <u>First Claim</u>

5       The First Claim alleges infringement by Malvern's Dispersion

6  Technology Software Version 5 ("DTS v.5") of Plaintiff's Dynamics

7  v. 6.2.05 software ("Dynamics v.6").  Specifically, Plaintiff

8  claims that Malvern has infringed Plaintiff's software in the

9  following ways: (1) the DTS v.5 hydrodynamic diameter estimate

10 software includes the same inputs and is calculated through the

11 same models as the Dynamics v.6 and yield the same results, SAC Ex.

12 18 at 128-29; (2) infringement of the Dynamics v.6 Statistics Table

13 because the operator can hide certain results, <u>id.</u> at 130-31; and

14 (3) infringement of the Dynamics v.6 "units" menu because each

15 displays a check mark next to the selected units, <u>id.</u> at 132-33.

16      a.  Calculator

17      Wyatt complains that the calculator "incorporates

18 substantially similar elements and produces substantially similar

19 results."  Ransom Decl., Ex. A at 10.  The hydrodynamic radius

20 calculator estimates the hydrodynamic radius of a molecule based on

21 the molecule's weight and molecular family.  Copyright Reply SUF ¶

22 ────────────

23      [8]Defendants explain that their motion for summary judgment
   with respect to Claims 1 through 3 is a partial motion because
24 Plaintiff asserts infringement of both screen displays and source
   code.  With respect to Claims 4, 5, and 7, however, Defendants
25 assert that "the registration does not extend to the source code,
   such that only the screen displays are at issue."  <u>See</u> Copyright
26 Mot. at 4 n.1; Copyright Reply at 6 n.5.  Although some of
   Plaintiff's evidence appears to mention source code when discussing
27 the Fourth, Fifth, and Seventh Claims, the Court could not find any
   characterization of the copyrights or Plaintiff's claims in
28 Plaintiff's materials that would be contrary to Defendants'
   explanation of the extent to which they encompass source code.

2.   The calculator contains a blank form that allows the user to enter the required information.  Id.  The calculator then returns a hydrodynamic radius estimate based upon mathematical relationship between the data values that are derived from empirical data.  Id. ¶¶ 2, 4. According to Defendants, the estimated diameter of a molecule is a function of well-known equations and the data necessary to create the equations can be found publicly.  Mattison Decl. ¶ 10.  Wyatt disagrees only in part: Wyatt agrees that the basic relationship is defined through a well-known equation, see Copyright SGI ¶ 36; Copyright Opp'n at 10, but represents that the calculations are based on a proprietary model, see Collins Decl. ¶ 8; Copyright Opp'n at 10.  Plaintiff's calculator requires the user to enter four values ("DynaPro model," "Molecular Family," "Molecular Weight," and "Power") and provides two different results (estimated hydrodynamic radius and data about the requirements to run an experiment on that particular particle).  Ransom Decl., Ex. B at 23.  Defendants' software includes a single input (molecular weight) and returns four hydrodynamic diameter estimates as a result (one for each of the four "molecular families").  Id.

     After analytical dissection, the Court finds that there is no substantial similarity between the screen displays of the two calculators.  Plaintiff cannot protect the idea of the hydrodynamic radius calculator based on molecular weight.  Additionally, Plaintiff cannot protect functions or elements that are indispensable to the idea of a hydrodynamic radius calculator. Defendants have submitted evidence that molecular weight is an indispensable input value and estimated hydrodynamic radius or diameter is an indispensable output value.  Mattison Decl. ¶ 10.

13

1   Plaintiff's cited evidence does not address this issue.  <u>See</u>

2   Collins Decl. ¶¶ 8-9.  A calculator is a method of operation that

3   does not enjoy copyright protection.  17 U.S.C. § 102(b); <u>Calyx</u>

4   <u>Tech.</u>, 2005 WL 2036918 at *3.  Moreover, to the extent the screen

5   display is a "blank form," it is also generally not entitled to

6   protection.  37 C.F.R. § 202.1; <u>Bibbero</u>, 893 F.2d at 1107-08.  What

7   remains is the arrangement of the screen display.  There are

8   limited ways to display the information the idea rests on

9   conveying.  Here, they are not "virtually identical," <u>see</u> <u>Apple</u>, 35

10  F.3d at 1442, 1449, as the forms ask for different information.[9]

11                    b.    Statistics Table (Hiding/Showing Results,

12                          Units)

13       Plaintiff's "statistics table" allows the user to compare

14  measurements.  The interface allows the user to modify which data

15  is visible and what units of measure are displayed.  SAC, Ex. 18 at

16  130, 131.  Malvern's software also allows a user to compare

17  experiment data.  The types of data included on Plaintiff's table

18  are mean, standard deviation, and %S.  <u>Id.</u> at 130.  The idea for a

19  table that allows the user to compare values generated by

20  experiments is not protectable, nor are calculations such as means,

21  standard deviations, and percentages, which are common mathematical

22  formulas.  Common ways of organizing and depicting data, such as a

23  table view and an option to hide columns are common ways to display

24  information.  <u>Cf.</u> <u>Apple</u>, 35 F.3d at 1444.  The Court agrees with

25

26       [9]Without analysis, Plaintiff relies on the declaration of
    Brent Fulgham to support its argument that certain elements are
27  "original."  The declaration does not provide a foundation for
    knowledge related to originality as that term is used in the
28  copyright context.

1  Defendants that all of the similarities rest in these common data-
2  display issues.  To the extent Plaintiff argues that the drop-down
3  "units" menu is substantially similar, the Court notes that the
4  menu commands are not protected.  See <u>Lotus Dev. Corp. v. Borland</u>
5  <u>Int'l, Inc.</u>, 49 F.3d 807, 815 (1st Cir. 1995).

6          2.  <u>Second Claim</u>

7       In the Second Claim for Relief, Plaintiff alleges that
8  Malvern's ZetaSizer Nano software infringes the copyright for the
9  software program Dynamics v.6.3.40.  Plaintiff specifically alleges
10 that the "tree design" interface and the standard operating
11 procedure features of the two works are substantially similar.  SAC
12 ¶¶ 86-87 & Ex. 19 at 134-35.

13              a.  Tree Design

14      Plaintiff's software allows a user to specify the parameters
15 for a given experiment.  Copyright Reply SUF ¶ 8.  The screen
16 display is organized using a "tree design structure."  <u>Id.</u>  Once a
17 user selects the information he or she wishes to view, that
18 information appears on the right side of the screen.  <u>Id.</u>
19 Malvern's "SOP" or "standard operating procedure" interface allows
20 a user to control the parameters for Zetasizer Nano experiments.
21 Additionally, there appear to be some differences between the
22 functionality of the two designs.  <u>See</u> Mattison Decl. ¶¶ 14-17.
23 Although Plaintiff attempts to dispute this fact, the purported
24 evidence supporting a similarity in functionality is not presented
25 in an admissible way.  <u>See</u> Collins Decl. ¶¶ 15-18; Defs.'
26 Evidentiary Objections, ¶¶ 15-17 (pp. 10-13).  In any event, the
27 Court addresses the tree design structure without reference to the
28 functionality behind them.  <u>See Sega</u>, 977 F.2d at 1524.

1    To the extent Plaintiff alleges that Malvern's display

2 infringes Plaintiff's copyright because it organizes information

3 using a "tree design" interface, that organizational approach is

4 common and flows from computer screen displays.  Likewise, the idea

5 and function of choosing actions to be included in an experiment

6 cannot be protected.  Aside from those similarities, the two

7 displays convey different information.  See SAC, Ex. 19 at 134.

8 Although they have a similar look, the Court agrees that they are

9 not similar enough to fall within the thin protection afforded to

10 the display.  Accordingly, the Court finds that there is no genuine

11 issue as to substantial similarity.

12              b.   SOP Player

13    Dynamics also includes a feature that allows a user to repeat

14 the same action multiple times within an experiment.  Copyright

15 Reply SUF ¶ 11.  The user can customize which actions will be

16 performed during the experiment by selecting options from a list

17 and clicking an "Add" or "Delete" button.  Id.  Like the DynaPro,

18 Malvern's SOP player also allows a user to repeat an action

19 multiple times within an experiment and to customize the experiment

20 by selecting the options from a list.  SAC, Ex. 19 at 135; Mattison

21 Decl. ¶ 19.[10]  Malvern's SOP Player selection menu includes icons,

22 while Wyatt's is text-only.  The programs have overlapping options,

23

24

25

26 ─────────────

27    [10]Although Plaintiff suggests this similarity between the
Malvern SOP Player and the DynaPro is disputed, Plaintiff points to
28 no evidence supporting such a dispute.  See Copyright SGI ¶ 12
(citing Phil Wyatt Decl. ¶¶ 11-12).

1    but are labeled differently, are not totally coextensive, and are

2    sometimes in different locations.  SAC, Ex. 19 at 135.[11]

3         Methods for organizing information and commands are "methods

4    of operation" that are both unprotected and common to software

5    programs.  Focusing on the "unique selection and arrangement of

6    Malvern's screen display" likewise yields no substantial

7    similarity, as the displays contain noticeable differences.  For

8    example, the Malvern "SOP Player" is styled as creating a

9    "playlist" with icons, while the Wyatt DynaPro portrays a text-only

10   command structure.  Given the thin protection already afforded to

11   Plaintiff's work, there can be no substantial similarity as a

12   matter of law.

13        The Court therefore grants the Motion with respect to the

14   screen displays for the Second Claim.

15             3.   Third Claim

16        Plaintiff's Third Claim alleges infringement of the "Axial

17   Ratio (Elliptical Shape) Calculator," a support calculation

18   included in Dynamics Software v. 5.26.56 that is referred to as the

19   Perrin Shape Factor.  SAC ¶ 94.  Plaintiff alleges that Defendants'

20   DTS "contains Protein Utilities including 'Calculations' containing

21   a 'Shape Estimate' section."  Id. ¶ 95.  Plaintiff alleges that the

22   DTS "implements a substantially identical function in virtually the

23   same manner."  Id.  Plaintiff appears to allege infringement (1) of

24   an axial ratio calculator that estimates the shape of a molecule

25   based on its molecular weight, specific volume, and hydrodynamic

26

27            [11]Although Plaintiff suggests this comparison is disputed, he
     points to no evidence supporting such a dispute.  See Copyright SGI
28   ¶ 13 (citing Collins Decl. ¶¶ 15-18).

                                    17

1 radius and (2) a calculator that estimates a molecule's weight

2 based on its hydrodynamic radius.  <u>Id.</u> ¶¶ 94-95 & Ex. 20 at 136-38.

3                 a.    Axial Ratio Calculator

4     Plaintiff's Axial Ratio (Elliptical Shape) Calculator allows

5 the user to estimate the shape of a protein based upon a measured

6 radius and molecular weight.  Ransom Decl., Ex. C (Collins Depo.)

7 at 27:5-9.  It contains a blank form that allows the user to enter

8 data about a molecule, including molecular weight, specific volume,

9 and measured radius.  Ransom Decl., Ex. B. at 34.  The theoretical

10 basis for Plaintiff's calculator is a series of mathematical

11 equations referred to in the scientific community as the "Perrin

12 shape factor."  Ransom Decl., Ex. C (Collins Depo.) at 29.  Protein

13 Solutions found a way to articulate the Perrin series of equations

14 – a preexisting nonproprietary formula – in C++ code.  <u>Id.</u> at 31-

15 32.  In order to calculate the axial ratio using the Perrin

16 equations, three values are necessary: molecular weight, radius,

17 and volume.  <u>Id.</u> at 33-34.  Malvern's software also includes a

18 calculator that estimates shape using the Perrin shape factor.  <u>See</u>

19 Mattison Decl. ¶¶ 20-21.

20     The idea of an axial ratio calculator, the idea of using the

21 Perrin equations, and elements that are indispensable to those

22 ideas, are not protected.  Rather, as relevant to this motion,

23 Plaintiff's infringement claim rests on the unique selection and

24 arrangement of Plaintiff's screen display.  Plaintiff points to the

25 following similarities: (1) the input variables of the two

26 calculators are the same, and presented in the same order; (2) the

27 output variables of the two calculators are listed in the same

28 order; and (3) both designs incorporate simple "boxes" for the

1  input and display of data.[12]  Collins Decl. ¶ 29.  Additionally,

2  Plaintiff argues that its particular method of implementing the

3  Perrin function need not be as it and Malvern did.  Plaintiff

4  offers two examples of other ways to implement an axial ratio

5  calculator: one used in a program called SEDNTERP and one used in

6  an earlier version of Protein Solutions software.  See id. ¶¶ 25-

7  26, 28 & Exs. 2-5.  Plaintiff points out the different input

8  choices and graphical display of the former, see id. Exs. 2-3, and

9  the open window boxes of the latter, see id. Ex. 5.

10     Defendants do not infringe Plaintiff's copyright by using a

11  blank form, which in and of itself is not protectable.  Bibbero,

12  893 F.2d at 1107.  Defendant argues that because the layout of a

13  screen display is "driven by functionality and contains no artistic

14  elements, it cannot receive copyright protection."  Copyright Mot.

15  at 13.  While the Court finds that the two screens are nearly

16  identical in look, the Court cannot find a genuine issue as to

17  infringement here.  Although there may be more than one way to

18  display and arrange the information, the options are limited: even

19  the other calculators cited by Plaintiff involve a similar, form-

20  type look, and the existence of two other ways to convey the

21  information does not suggest that there are significantly more.

22  Granting copyright protection in Plaintiff's look – a blank form

23  that is perhaps the simplest, most purely functional approach –

24  would risk significantly limiting the ways to express this

25  nonproprietary idea.  The Court therefore holds that any protection

26

27        [12]  The Court notes that, although the input and output values

28  may reflect the same information in the same order, they do not
    have the same labels.

1  in the arrangement of Plaintiff's calculator is, at most, paper-

2  thin.  The minor differences between the forms are enough to defeat

3  infringement on that form.

4  b.   Molecular Weight Calculator

5  The molecular weight calculator estimates a molecule's

6  molecular weight based on its hydrodynamic radius.  Copyright Reply

7  SUF ¶ 18.  The calculator contains a blank form that allows the

8  user to enter the required information, and then returns two

9  estimated weight values: one derived from a "standard curve" and

10  one based on a molecular volume model.  Id.  Malvern's software

11  also contains a molecular weight calculator, which includes boxes

12  on a blank form.  SAC, Ex. 20 at 137-38.  Unlike the DynaPro

13  calculator, Malvern's calculator does not provide a volume-based

14  estimate; rather, it returns only "standard curve" estimates.

15  Mattison Decl. ¶¶ 23-24.  Additionally, while the DynaPro

16  calculator returns two estimates for one molecular family at a

17  time, the Malvern calculator returns only a standard curve estimate

18  each for four molecular protein families.  Id.; Ransom Decl., Ex. B

19  at 35-36.  None of the labels on the calculators are the same,

20  though they appear to represent the same or related values.  Ransom

21  Decl., Ex. B at 35-36.[13]

22  For the same reasons discussed with respect to the calculators

23  in Claim 1, the Court finds that there is no genuine issue of

24  material fact as to infringement of the screen displays.

25  4.   Fourth Claim

26

27  [13]Plaintiff purports to contest various portions of Malvern's

28  calculator as disputed.  After reviewing the cited evidence, the
Court does not see a dispute as to these particular features.

1    Plaintiff's Fourth Claim alleges infringement of the Dynamics
2    Installation CD v. 6.3.40 by Defendants' DTS software.   SAC ¶¶ 99,
3    103.   In particular, Plaintiff argues that its PSI Static MW
4    Calculator software module and Malvern's Zetasizer Nano DTS
5    "Protein Utilities" "Debye Plot" are substantially similar.
6    Collins Decl. ¶ 35.   Plaintiff's software includes a tool called a
7    "Zimm Plot," which is a "plot of the static light scattering signal
8    as a function of concentration and scattering angle.   Ransom Decl,
9    Ex. C (Collins Decl.) at 35-36; Mattison Decl. ¶ 26.   Plaintiff's
10   software includes a blank form in which the user can input 13
11   different parameters, each of which affects the resulting Zimm
12   plot, and allows two possible units of measure.   SAC, Ex. 21 at
13   139.   Malvern's software permits the user to generate a Debye Plot,
14   a plot that also represents scattered light intensity data, with
15   some differences.[14]   Most of the parameters it uses are required
16   for the measurement or allow it greater functionality.   Ransom
17   Decl., Ex. C (Collins Depo.) at 37-38.   As Plaintiff has previously
18   described the two layouts:

19       Most of the [input] parameters . . . are identical
         (differences are slight changes to the names or the 'units'
20       associated with the values).   The layout is different.   The
         'calculated paramters' are presented on the left hand side in
21       the Protein Solutions calculator vs. the right hand side in
         the Malvern calculator.   The Malvern presents the 'User
22       Defined Parameters' across the top in a horizontal fashion
         rather than a vertical fashion – this is because the Protein
23       Solutions calculator presents both the data table and the
         graph on the same page whereas Malvern has separated these
24       into two different 'tabs'.

25   Ransom Decl., Ex. B at 40.

26   _____

27       [14]"[A] Debye plot would be the static scattering versus
     concentration of the analyte at a specific scattering angle," while
28   "a Zimm plot would be a scattering versus concentration over a
     series of angles."   Ransom Decl., Ex. C (Collins Depo.) at 36.

1    The Court finds that there are no genuine issues of material
2    fact as to infringement.  The majority of the similarities appear
3    to arise from similar ideas, facts, and function, and a blank form.
4    The display itself is, in fact, different.  Although Plaintiff has
5    submitted what appears to be evidence suggesting similarities in
6    the underlying code or access to the material, see Collins Decl. ¶¶
7    35-43, the Court does not see a reading of this evidence that bears
8    on substantial similarity in the screen display, and Plaintiff has
9    provided no analysis whatsoever that would guide the Court in the
10   inferences it would ask the Court to draw from the cited paragraphs
11   of the Collins declaration, or how they bear on Plaintiff's
12   argument.[15]  Accordingly, the Court does not see a genuine issue of
13   material fact as to the screen displays alleged to be infringing in
14   the Fourth Claim for Relief.

15            5.   Fifth Claim

16       The Fifth Claim alleges that Malvern's Zetasizer Nano software
17   infringes Plaintiff's Dynamics Installation CD v.5.26.56.
18   Specifically, Plaintiff alleges that a feature in Malvern's
19   software entitled "Trend – Temperature Ranges" infringes
20   Plaintiff's "Write DSS File" feature.  SAC, Ex. 22 at 144.
21   Plaintiff's "Write DSS File" screen allows a user to specify the
22   initial and final temperatures for an experiment and direct the
23   DynaPro to take measurements at user-specific intervals.  Ransom
24   Decl., Ex. C (Collins Depo.) at 40-41.  The screen display includes
25   seven blank spaces in which the user can input information,
26   including: (1) initial temperature settings, (2) final temperature

27   ────────────

28       [15]Additionally, at least some of Plaintiff's evidence appears
     to be problematic.  E.g., Defs'. Objections at ¶¶ 41-42.

setting, (3) increment, (4) wait time, and (5) number of
measurements.  SAC, Ex. 22 at 144.  Likewise, Malvern's software
allows the user to specify the starting and ending temperatures for
an experiment and the temperature increment at which measurements
should be taken.  Id.  Malvern's screen display includes four
inputs: (1) start temperature, (2) end temperature, (3) temperature
interval, and (4) number of steps.  Id.

     The idea of a feature that allows a user to specify
temperature values and increments for an experiment, as well as
elements that are indispensable to the idea (i.e., start
temperature, end temperature, and increment value), are not
protected.  To the extent Plaintiff's display is a blank form,
Plaintiff likewise cannot succeed on its infringement claim.
Looking at the arrangement of the screen displays, the Court notes
that they have different layouts, different options, and different
ways of adjusting the variables.  See SAC, Ex. 22 at 144.  Given
the thin protection afforded to copyright claims, the Court finds
that these differences defeat an infringement claim with respect to
the screen displays.  Plaintiff has pointed to no evidence that
would raise a genuine issue of material fact as to anything but
access.  See Copyright SGI ¶¶ 24-26 (citing Collins Decl. ¶¶ 45-
47).

          6.   Summary

     As discussed above, the Court finds in Defendants' favor on
the screen displays asserted in the First through Fifth Claims,
particularly in light of the thin protection provided to the
software displays at issue.  As far as the Court can tell from
reviewing Plaintiff's submissions (which lack helpful analysis),

1  Plaintiff has not presented evidence supporting a genuine issue of

2  material fact as these claims.

3      **C.   Claim 7**

4      In the Seventh Claim, Plaintiff alleges that Malvern's website

5  infringes the Protein Solutions Website.   Specifically, Plaintiff

6  claims that Malvern's "Zetasizer Nano Minimum Concentration

7  Calculator" infringes Plaintiff's "DynaPro Minimum Concentration

8  Calculator."   SAC, Ex. 24 at 150-52.   Because of their limited

9  sensitivity, DLS instruments require a minimum concentration of

10 particle to perform measurements of it.   Mattison Decl. ¶ 30.   The

11 minimum concentration required by Zetasizer Nano instruments is

12 slightly different than that required by DynaPro insruments.   Id.

13     Plaintiff's website includes a calculator that uses molecular

14 weight to determine minimum concentration.   SAC, Ex. 24 at 151.   A

15 user inputs the protein's molecular weight, and the calculator

16 returns three numbers representing the minimum concentration

17 required for a different product model.   Id.   The calculator

18 includes buttons labeled "calculate" and "clear."   Id.   Malvern's

19 calculator also includes molecular weight as the sole input and a

20 results screen that gives the minimum concentration by product

21 model.   Id. at 150.   It further includes a display of the estimated

22 radius and diameter of the protein and data regarding requirements

23 to measure zeta potential.   Id.[16]

24

25

_____

26     [16]Plaintiff asserts that these facts are "disputed," but none
of the cited evidence calls any of them into question.   (Plaintiff
27 generally cites to the "Wyatt" Declaration.   The Court assumes that
Plaintiff refers to the Declaration of Phil Wyatt, as opposed to
28 the Declaration of Geof Wyatt.   However, the Phil Wyatt Declaration
does not seem to raise a disputed issue as to any of these facts.)

1    For the reasons discussed above with respect to the First and
2    Third Claims, the Court finds that there is no genuine issue of
3    material fact as to substantial similarity.

4         **D.   Claims 6 and 8**

5    Defendants move for summary judgment on the Sixth and Eighth
6    Claims for Relief on the ground that the copyrights in the works
7    underlying those claims have been waived or abandoned.

8    Waiver and abandonment of copyright protection provide
9    defenses to claims of copyright infringement.  "[W]aiver or
10   abandonment of copyright 'occurs only if there is an intent by the
11   copyright proprietor to surrender rights in his work.'"  <u>A&M</u>
12   <u>Records, Inc. v. Napster, Inc.</u>, 239 F.3d 1004, 1026 (9th Cir. 2001)
13   (quoting 4 Melville B. Nimmer & David Nimmer, Nimmer on Copyright
14   § 13.06 (2000)).  Generally, "an overt act evidencing such an
15   intent is necessary to establish abandonment."  4 Nimmer on
16   Copyright § 13.06; <u>Hampton v. Paramount Pictures Corp.</u>, 279 F.2d
17   100, 104 (9th Cir. 1960) ("Rights gained under the Copyright Law .
18   . . may be abandoned.  Abandonment of such rights, however, must be
19   manifested by some overt act indicative of a purpose to surrender
20   the rights and allow the public to copy.").  The Ninth Circuit has
21   suggested that a copyright holder may abandon some rights without
22   abandoning others.  <u>See</u> <u>Micro Star v. Formgen, Inc.</u>, 154 F.3d 1107,
23   1114 (9th Cir. 1998) ("Given that it overtly encouraged players to
24   make and freely distribute new levels, FormGen may indeed have
25   abandoned its exclusive right to do the same. But abandoning some
26   rights is not the same as abandoning all rights, and FormGen never
27   overtly abandoned its rights to profit commercially from new
28   levels.").  <u>But see</u> 4 Nimmer on Copyright § 13:06 & n.17.

1    In <u>Hadady Corp. v. Dean Witter Reynolds, Inc.</u>, 739 F. Supp.

2  1392, 1399 (C.D. Cal. 1990), the court found that the copyright

3  holder had abandoned copyright protection and granted summary

4  judgment in favor of defendant on that issue.  The <u>Hadady</u> plaintiff

5  distributed a weekly newsletter, which included a copyright notice

6  that stated the copyright would last for two days.  <u>Id.</u>  The <u>Hadady</u>

7  notice stated: "The information contained in this letter is

8  protected by U.S. copyright laws through noon EST on the 2d day

9  after its release[.]" <u>Id.</u> at 1395. Even though the defendant did

10  not subscribe to the newsletter, the court held that the plaintiff

11  had "abandoned copyright protection to the information contained

12  therein with respect to the whole world." <u>Id.</u>  Summary judgment

13  was warranted even though the plaintiff had submitted a declaration

14  stating that "he did not subjectively intend by the two day notice

15  to abandon Hadady Corp.'s copyright interest." <u>Id.</u>  Because his

16  declaration "fl[ew] in the face of the only possible meaning the

17  two-day copyright notice conveyed," the court explained that it did

18  not raise a triable issue of fact.  <u>Id.</u>  Moreover, although

19  abandonment ended when the plaintiff changed the form of the

20  copyright notice, the revised notice did not avoid abandonment as

21  to the newsletters that were distributed prior to the change.  <u>Id.</u>

22    Claim Six addresses U.S. Copyright No. TX 6-812-053, "PSI

23  BOOKS: DYNAMIC LIGHT SCATTERING."  SAC ¶¶ 115-23.  According to the

24  SAC, PSI Books: Dynamic Light Scattering is end-user learning

25  tools, and includes a library, "PSI Books." <u>Id.</u> ¶ 119.  Claim

26  Eight addresses U.S. Copyright No. TX 6-816-833, "PSI BOOKS." <u>Id.</u>

27  ¶¶ 132-40.  According to the SAC, PSI Books is software which

28  includes dialog support for the implementation of the DLS system.

1   Id. ¶ 135.  All of the written work reflected in PSI Books: Dynamic

2   Light Scattering is also included in the larger volume that is PSI

3   Books.  See Ransom Decl. ¶ 7 & Exs. D-E.[17]

4        The front page of PSI Books – both as distributed by Protein

5   Solutions and in the deposit materials that Wyatt provided to the

6   Copyright Office – includes the following statement: "Currently,

7   there are no restrictions on this material.  You may install it on

8   as many PC systems as you like, and you may distribute it freely to

9   your colleagues."  Ransom Decl., Ex. E at 275.  Plaintiff's

10  copyright 30(b)(6) witness affirmed that Protein solutions made

11  these materials freely available to the public and had no problem

12  with their distribution.  See Ransom Decl., Ex. C (Robert Collins

13  Depo.) at 47:2-14, 48:2-5.  In his declaration submitted in support

14  of Plaintiff's Opposition to the Motion, Collins states that

15  Protein Solutions "never intended to 'abandon' PSI Books," but

16  rather intended "to make the material readily available to end

17  users and potential end users on a widespread, global basis."

18  Collins Decl. ¶ 51.  In particular, "Protein Solutions encouraged

19  its customers and prospective customers to distribute PSI Books,

20  thereby promoting Protein Solutions and its unique capabilities and

21  technologies, chiefly the DynaPro instrument, throughout the

22  world."  Id.

23       Defendants analogize this case to Hadady.  They argue that the

24  Collins Declaration does nothing more than state a subjective

25  intent.  In the face of what they point to as a clear statement

26  ─────────────────────

27       [17]Plaintiff suggests that this is disputed, but the cited
    evidence in no way addresses the issue of whether PSI Books
28  contains PSI Books: Dynamic Light Scattering.  See Copyright Reply
    SSUF ¶ 29.

1  that there were "no restrictions" on the material and deposition
2  testimony that supports an intent to freely allow distribution,
3  Defendants argue that the Collins Declaration does not raise a
4  triable issue.  The Court agrees.  First, the Court notes that
5  Defendants have pointed to evidence that would support a finding of
6  an overt act manifesting an intent to abandon copyright protection.
7  The first page of the relevant material expressly states that there
8  are "*no restrictions*" on the material.  Moreover, at his
9  deposition, Collins testified that "if someone downloaded [the
10 material] from the website and then made a thousand copies and
11 handed it out on the street corner, Protein Solutions would have
12 been fine with [those actions.]" Ransom Decl., Ex. C (Collins
13 Depo.) at 47:10-14.  Additionally, Collins confirmed that Protein
14 Solutions never "placed any restrictions on what someone who
15 received a copy of PSI Books could do with it."  Id. at 48:2-5.
16 Although Protein Solutions' language does not exactly mirror that
17 in Hadady – it said "no restrictions" as opposed to explicitly
18 framing copyright protection as being two days in length –
19 Plaintiff does not argue that this is a meaningful distinction, and
20 the Court also does not view it as one.  By stating that there were
21 "no restrictions" on the material, the language effectively stated
22 that the author had abandoned those rights.
23      There is no evidence or argument before the Court that would
24 create a genuine issue of material fact to the contrary.  For
25 example, Plaintiff does not suggest that other language in the
26 notice would mitigate any abandonment argument.  For instance,
27 Plaintiff does not argue that the use of the term "currently" or
28 the examples provided by the notice limited the blanket "no

restrictions" language.[18]   Moreover, the only cited portions of the
deposition testimony that directly ask about policies and
restrictions – as opposed to conversations or discussions –
indisputably support that there were none.   Finally, Plaintiff does
not suggest that Protein Solutions may have abandoned certain
exclusive rights conferred by the Copyright Act, but not others
that are relevant here.   Cf. Micro Star, 154 F.3d at 1114.   Indeed,
Plaintiff's argument on the issue of abandonment rests entirely on
the Collins Declaration for factual support.[19]   See Copyright Opp'n
at 22-23.

     Plaintiff has not presented evidence (or argument about the
inferences to be drawn from Defendants' evidence) that would create
a triable issue as to abandonment.   In light of the overt
statements and the deposition testimony, then, the Court finds that
summary judgment is warranted in Defendants' favor on the Sixth and
Eighth Claims.

     **E.   Defendant Dolak: Claims 1 through 8**

     Defendant Dolak also argues that he is not individually liable
with respect to the First through Eighth Claims.   Liability for
copyright infringement exists "if the defendant engages in personal
conduct that encourages or assists the infringement."   Napster, 239
F.3d at 1019 (internal quotation marks omitted).   Knowledge and
material contribution are required.   See id. at 1020, 1022.

---

[18]Nor does Plaintiff suggest that the "no restrictions"
language should be construed as a license (comparable to, for
example, an open source license for source code).

[19]Contrary to Plaintiff's apparent argument, Defendants do not
argue that the lack of a copyright notice attached to the document
manifested an intent to abandon protection.   See Copyright Opp'n at
22:2-23:3.

1    Defendant has submitted evidence that David Dolak had no role
2    in the creation of any of the allegedly infringing works in the
3    First through Eighth Claims.  Dolak Decl. ¶¶ 3-5.  In response,
4    Plaintiff submits evidence that addresses the copyrights that are
5    the subject of the Ninth Claim, see Copyright SGI ¶ 32 (citing
6    Collins Decl. ¶¶ 68-71), but provides no explanation how that
7    evidence bears on the First through Eighth Claims.  In its
8    Opposition, Plaintiff also suggests (1) that as the webmaster of
9    Protein Solutions, Dolak had knowledge of and materially assisted
10   in the copyright infringement, and (2) that Dolak receives
11   performance bonuses tied to the sale of Malvern's product.  See
12   Copyright Opp'n at 4.  Plaintiff points to Exhibit 22 of the
13   Frisenda Declaration, portions of the Dolak Deposition, as evidence
14   supporting these assertions, but does not explain that citation.
15   On the Court's review of that Exhibit, the only portion that would
16   potentially appear to support Plaintiff's argument is testimony
17   that Dolak linked to the Malvern website.  Plaintiff does not
18   support its other statements.

19   Defendants do not specifically present evidence that would
20   negate contributory infringement by Dolak; that is, while they have
21   presented evidence that Dolak was not involved in the creation of
22   the infringing products, they have not presented evidence that he
23   neither knew of them nor materially contributed to any potential
24   infringement through his sales.  Although the Court might be
25   hesitant to accept Plaintiff's submission as sufficient to defeat
26   summary judgment had Defendants met their initial burden, the Court
27
28

1  finds that they have not done so. The Court therefore declines to

2  enter summary judgment as to Dolak's liability.[20]

3      **E.    Actual Damages for Claim 9**

4          Defendants move for summary judgment on damages for

5  Plaintiff's Ninth Claim on the ground that Plaintiff has no actual

6  damages as to that claim.  In particular, Defendants argue that

7  Plaintiff does not have evidence connecting infringement of the PSI

8  Frequently Asked Questions (the copyrighted work that is the basis

9  of claim 9) with actual damages.  The Court agrees.  Although

10 Plaintiff's disclosures and the Wyatt declaration provide a

11 sufficient basis for Plaintiff to seek to prove actual damages in

12 this suit as a whole, at no point do any of those documents provide

13 a connection between claim 9 and actual damages.  The Court

14 therefore grants the motion as to Claim 9 actual damages.

15     **F.    Statutory Damages and Attorneys' Fees**

16         Finally, Defendants move for summary judgment on the issues of

17 statutory damages and attorneys' fees for Plaintiff's copyright

18 claims.  Pursuant to 17 U.S.C. § 412, a plaintiff's entitlement to

19 statutory damages is limited.  That section provides, in relevant

20 part:

21     In any action under this title, other than . . . an action for
       infringement of the copyright of a work that has been
22     preregistered under section 408(f) before the commencement of
       the infringement and that has an effective date of
23     registration not later than the earlier of 3 months after the
       first publication of the work or 1 month after the copyright
24     owner has learned of the infringement . . . , no award of
       statutory damages or of attorney's fees, as provided by
25     sections 504 and 505, shall be made for—

26

27         [20]That said, with respect to screen displays, the Court has
   already held that there are no genuine issues of material fact as
28 to infringement.  The Court's order has not addressed source code.

31

(1) any infringement of copyright in an unpublished work commenced before the effective date of its registration; or

(2) any infringement of copyright commenced after first publication of the work and before the effective date of its registration, unless such registration is made within three months after the first publication of the work.

17 U.S.C. § 412.  It is undisputed that the copyrights' effective dates were more than three months after the first publication of the work underlying the registration and that Defendants' alleged infringement of each copyright commenced prior to Plaintiff's registration of the copyright.  See Copyright SGI ¶¶ 34-35. Because Plaintiff is therefore not entitled to statutory damages or attorneys' fees, the Court grants summary judgment on this issue.

**G.   Summary**

As discussed above, the Court grants Defendants' partial summary judgment motion on the copyright claims as to all but Dolak's liability.  The Court denies that portion of the motion without prejudice.

**IV.   DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AS TO PLAINTIFF'S NON-COPYRIGHT CLAIMS**

Defendants move for partial summary judgment on the remaining five claims in the SAC, the non-copyright claims.  Plaintiff has opposed the Motion.

**A.   Tenth Claim for Relief: Lanham Act**

Plaintiff's Tenth Claim for Relief alleges a claim for false advertising under § 43 of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B).  SAC ¶¶ 149-55.  Defendants move for summary judgment solely on the damages claim, and solely on the ground that

1  Plaintiff cannot prove that it has suffered actual injury as a

2  result of the allegedly false advertising.[21]

3      The Lanham Act authorizes injunctive relief, damages, profits,

4  costs, and attorneys' fees, depending on what is appropriate in a

5  particular circumstance.  Section 1117(a) of Title 15 of the United

6  States Code, which governs damages, provides, in relevant part:

> When . . . a violation under [§] 1125(a) . . . of this title .
> . . shall have been established in any civil action arising
> under this chapter, the plaintiff shall be entitled . . .
> subject to the principles of equity to recover (1) defendant's
> profits, (2) any damages sustained by the plaintiff, and (3)
> the costs of the action. . . . In assessing profits the
> plaintiff shall be required to prove defendant's sales only;
> defendant must prove all element of a cost or deduction
> claimed. . . . If the court shall find the amount of the
> recovery based on profits is either inadequate or excessive
> the court may in its discretion enter judgment for such a sum
> as the court shall find to be just, according to the
> circumstances of the case.

14  15 U.S.C. § 1117(a).

15      Defendants argue that Plaintiff's must prove, as an essential

16  element of the cause of action, actual damages resulting from

17  allegedly false advertising.  With respect to injunctive relief, "a

18  competitor need not prove injury when suing to enjoin conduct that

19  violates section 43(a)" of the Lanham Act.  Harper House, Inc. v.

20  Thomas Nelson, Inc., 889 F.2d 197, 210 (9th Cir. 1989).  To obtain

21  monetary relief under § 1117, however, a plaintiff generally "must

22  prove both the fact and the amount of damage," which "are typically

23  measured by any direct injury which the plaintiff would have earned

24  but for the infringement."  Lindy Pen Co., Inc. v. Bic Pen Corp.,

25  982 F.2d 1400, 1407 (9th Cir. 1993)(citing 2 J. Thomas McCarthy,

---

27      [21]Although Plaintiff seems to present argument on the topic,
the Court notes that Defendants' motion does *not* address whether
28  any advertising was false or the availability of injunctive relief.

1  McCarthy on Trademarks and Unfair Competition § 30:27 (1984)).

2  "Because proof of actual damage is often difficult, a court may

3  award damages based on defendant's profits on the theory of unjust

4  enrichment."  Id.  As the Ninth Circuit explained in Harper House,

5  Inc. v. Thomas Nelson, Inc., "actual evidence of some injury

6  resulting from the deception is an essential element of the

7  plaintiff's case" when a plaintiff seeks actual damages.  889 F.2d

8  197, 210 (9th Cir. 1989) (emphasis in original).  The cases seem to

9  hold, however, that "an inability to show actual damages does not

10 alone preclude recovery under [15 U.S.C. §] 1117."  Lindy Pen, 982

11 F. 2d 1400, 1410-11 (9th Cir. 1993).  Rather, the Ninth Circuit

12 appears to prefer a "totality of the circumstances" approach.  Id.;

13 Southland Sod Farms v. Stover Seed Co., 108 F.3d 1134, 1136 (9th

14 Cir. 1997); see Healthport Corp. v. Tanita Corp. of Am., 563 F.

15 Supp. 2d 1169, 1181 (D. Or. 2008).  Cf. 5 McCarthy on Trademarks

16 and Unfair Competition § 30:77 (4th ed.) ("If plaintiff shows no

17 probability of actual loss caused by the infringement, the court

18 may deny any recovery of damages. Since it may be very difficult

19 for plaintiff to prove the fact and amount of damage to its good

20 will, plaintiff should be allowed the chance to prove this with

21 whatever evidence he can muster.").

22     The Court finds that summary judgment is not warranted here.

23 It is unclear whether Defendants simply move on actual damages

24 pursuant to 15 U.S.C. § 1117(a)(2) or on the entirety of § 1117(a)

25 relief.  In either case, because the statute and the Ninth Circuit

26 appear to provide an approach depending on equity and the totality

27 of the circumstances, and because actual damages can be

28 particularly difficult to prove, the Court finds summary judgment

1  inappropriate and prefers that Plaintiff be given the opportunity

2  to present evidence on these issues.  Although the evidence may not

3  ultimately be convincing or sufficient,[22] to the extent it relies

4  on the testimony of various individuals and the nature of the

5  industry, the Court finds that it is appropriate to allow that

6  evidence be heard at trial.  See Wyatt Decl. ¶ 34.

7      **B.   Eleventh Claim for Relief: Misappropriation of Trade**

8          **Secret**

9      The heart of Defendants' Non-Copyright Motion is the portion

10 challenging Plaintiff's trade secret claim.  The SAC alleges that

11 Defendants misappropriated the following trade secrets from Wyatt:

12 (1) the customer database; (2) confidential information relating to

13 the finances of Proterion; (3) confidential information relating to

14 research development, manufacturing, suppliers, and distributors of

15 Proterion; (4) confidential information relating to the technical

16 processes of Proterion; (5) confidential information relating to

17 the marketing and distribution agreements of Proterion's products;

18 (6) confidential information relating to types and volumes of

19 products sold to Proterion's customers; (7) confidential

20 information relating to Proterion's strategies and plans as to the

21 pricing of goods sold to Proterion's customers; (8) confidential

22 information relating to Proterion's entire marketing and production

23 plans, including its short term and long term strategy; (9)

24 confidential information relating to knowledge of customer

25 preferences of changes in Proterion's products; (10) confidential

26 information relating to Proterion's plans for new products and

27 _____

28     [22] See Ratner Decl., Ex. 22 (Collins Depo.) at 322:14-23
(Wyatt did not ask customers whether they were misled).

changes to existing products; and (11) confidential information relating to Acquired Assets set forth in the Purchase Agreement at ¶ 1.1(c)-(h).  SAC ¶ 165.  Defendants move for summary judgment on the grounds that (1) the trade secrets Plaintiff identifies do not constitute trade secrets, (2) they are not owned by Plaintiff, and (3) they were not used by Defendants.  Non-Copyright Mot. at 4. Plaintiff does not submit any legal analysis or argument on this subject, but appears to address the trade secrets through factual discussion.[23]

Pursuant to the Uniform Trade Secrets Act, codified in California at California Civil Code § 3426 *et seq.*, a plaintiff may bring a cause of action for monetary relief for "misappropriation." Cal. Civ. Code § 3426.3.  As relevant here, "[m]isappropriation" is

> (2) Disclosure or use of a trade secret of another without express or implied consent by a person who:
>          . . .

---

[23]As best it can, in considering the various arguments presented by this motion, the Court has carefully examined the evidence cited by Plaintiff and determined whether it is admissible and raises any genuine issues of material fact.  The Court emphasizes, however, that Plaintiff has left the Court with the primary task of inferring its legal and factual arguments from general descriptions and citations, which largely rely on conclusory declarations.  Additionally, at various points, Plaintiff has generally cited to exhibits containing multiple portions of deposition testimony – exhibits cited for various reasons throughout the Opposition, and therefore presumably containing information that is both relevant and not relevant to particular points – without indication as to which part of that testimony Plaintiff claims is supportive of which point. Similarly, Plaintiff cites to an exhibit purportedly consisting of the contents of the "Mattison CD" without pointing to specific portions of that CD and without any explanation as to what the various portions or pages of that exhibit represent.  As mentioned above, the Court has followed the citations and factual argument as best it can.  <u>See</u> <u>Carmen v. S.F. Unified Sch. Dist.</u>, 237 F.3d 1026, 1029-30 (9th Cir. 2001); <u>Forsberg v. Pac. Nw. Bell Tel. Co.</u>, 840 F.2d 1409, 1418 (9th Cir. 1988).

> (B) [a]t the time of disclosure or use, knew or had
> reason to know that his or her knowledge of the trade
> secret was:
>> (i) [d]erived from or through a person who had
>> utilized improper means to acquire it; (ii)
>> [a]cquired under circumstances giving rise to a duty
>> to maintain its secrecy or limit its use; or (iii)
>> [d]erived from or through a person who owed a duty
>> to the person seeking relief to maintain its secrecy
>> or limit its use[.]

Cal. Civ. Code § 3426.1(b)(2).  The term "improper means" includes

theft, bribery, misrepresentation, breach or inducement of a breach

of a duty to maintain secrecy, or espionage through electronic or

other means.  _Id._ § 3426.1(a).  And a "trade secret" is information

that (1) derives actual or potential independent economic value

"from not being generally known to the public or to other persons

who can obtain economic value from its disclosure or use" and (2)

is the subject of reasonable efforts to maintain its secrecy.  _Id._

§ 3426.1(d).  California law requires the plaintiff to "identify

the trade secret with reasonable particularity."  Cal. Civ. Proc.

Code § 2019.210.  Mere possession of a trade secret does not

constitute misappropriation.  _Central Valley Gen. Hosp. v. Smith_,

162 Cal. App. 4th 501, 528-29 (2008).

### 1.  Asset Purchase Agreement

Defendants move for summary judgment on a number of the

alleged trade secret claims on the ground that Plaintiff did not

acquire the trade secret through the Asset Purchase Agreement.

Specifically, Defendants argue that the APA's list of "Acquired

Assets," in conjunction with the APA Amendment, provide the limit

of what was acquired by Wyatt from Proterion.  Section 1.1 of the

APA provides:

> At the Closing, subject to Section 1.2, Seller shall sell and
> assign to Buyer, free and clear of all security interests,

encumbrances, restrictions on transfer, or adverse claims, and Buyer shall buy from Seller, all of Seller's right, title and interest in the following assets except any assets that constitute Excluded Assets (the "Acquired Assets"):

(a) The physical assets of Proterion effectively conveyed to Seller which are in the possession, custody or control of the Seller, exclusive of office equipment, furniture and related assets located at Proterion's office in Somerset, New Jersey.

(b) The website domain: Proterion.com.

(c) Exclusive rights to all software source and compiled code developed for Proterion, to the extent available to the Assignee.

(d) Exclusive rights to all customer databases, servers, prospective customer databases and servers, etc.

(e) Exclusive rights to all manufacturing software programs and databases relating to the manufacturing, resource and planning for manufacturing any equipment by Proterion.

(f) Exclusive rights to all documentation relating to the fabrication fo such instruments.

(g) Exclusive rights to all Aviv Instrument product drawings, know-how, etc.

(h) All patents and know-how relating to the PWR technology.

Ratner Decl., Ex. 1 (APA) at § 1.1.  Defendants note that information regarding finances, technical processing, marketing agreements, strategies and plans as to the pricing of goods, marketing and product plans and strategies, knowledge of customer preferences, and research development, manufacturing, suppliers, and distributors are not specifically listed in the Acquired Assets.  Because the Court finds that this information could plausibly be encompassed by (a)-(g), above,[24] the Court finds that the APA does not, in and of itself, provide a basis for summary judgment as to various of the trade secret arguments.

    2.   Protein Solutions Customer Database

_____

[24]For example, knowledge of customer preferences could be included in APA § 1.1(d), which uses the term "etc."

With respect to the customer database, Defendants move for summary judgment on the ground that there is no genuine issue of material fact as to whether Defendants used the information in the customer database.  Defendants set out in detail evidence supporting their claim that they did not use the customer database. See Mot. at 5-8; Non-Copyright SUF ¶¶ 9, 19-24.  Additionally, they argue that each of the bases Plaintiff identifies as supporting its claim (1) does not show that Defendants "used" information and (2) is contradicted by undisputed evidence.  Although the Court does not doubt that Defendants have proffered potentially legitimate explanations on which they may yet succeed at trial and have marshaled evidence in support of them, the Court finds that evidence presented by Plaintiff and inferences to be drawn from the entirety of the evidence leave genuine issues of material fact underlying this claim.  See, e.g., Collins Decl. ¶ 27. Accordingly, the Court denies summary judgment with respect to the customer database.[25]

### 3.   Protein Solutions' Financial Information

Plaintiff claims that Defendants misappropriated financial information, specifically financial data "embodied in the Sage software program data files and detailed budgetary data contained in MS Word, Excel, and/or email text formats."  Ratner Decl., Ex. 3 at 30:9-12.  That information "[i]ncludes detailed historical

---

[25]To the extent Plaintiff's claim is based *solely* on Defendant Dolak's use of certain information after Dolak left Proterion but before Wyatt purchased the company's assets, the Court agrees with Defendants that the APA does not appear to transfer ownership of the cause of action to Plaintiff.  See Ratner Decl., Ex. 1 at § 1.2 (excluding causes of action from transfer).  This prior disclosure could be evidence of access probative of additional use after Wyatt acquired the assets, however.

financial performance by model, territory, and time; cost of goods
sold; sales and marketing budgets and performances for
comprehensive annual plans incorporating advertising, website,
[t]ravel, trade-shows, direct mail, etc." Id. at 30:12-15.   In
moving for summary judgment on misappropriation of this
information, Defendants argue (1) that this information is "too
imprecise to constitute trade secrets," Non-Copyright Mot. at 10,
and (2) Plaintiff has no evidence that Defendants actually "used"
the information.

      With regard to the former, the Court finds that summary
judgment is not warranted.   Plaintiff's responses to
interrogatories explain what the information is and why it was
valuable and important.   See Ratner Decl., Ex. 3 at 30; id., Ex. 5
at 86.   A compilation of data, including customer invoices and
pricing, can be deserving of trade secret protection.   See, e.g.,
Amerisourcebergen Drug Corp. v. Am. Assoc. Druggists, Inc., 2008 WL
248933, *25 (E.D. Pa. Jan. 29, 2008).

      In support of their argument that there is no evidence of use,
Defendants note that Plaintiff primarily relies on former Protein
Solutions employees' access to certain information, and submit the
declarations of Dolak, Mattison, and Nobbman, who state that they
never used any information they may have had.   In Opposition,
Plaintiff points to access at Wyatt.   See Collins Decl. ¶ 30.
Plaintiff also argues that Dr. Mattison possessed a CD-ROM in his
Malvern office containing "an abundance of data related to
Proterion matters," see id.; Non-Copyright Opp'n at 8, though the
cited evidence lacks foundation, see Defs.' Objections at 84-85;

1  Fed. R. Evid. 602.[26]  Additionally, Plaintiff points to access that

2  Malvern had through its participation in the bidding process to

3  acquire Proterion assets, see Non-Copyright Opp'n at 8; Collins

4  Decl. ¶¶ 31-32, though this evidence also lacks factual foundation,

5  see Defs.' Objections at 85-86; Fed. R. Evid. 602.  Finally,

6  Plaintiff argues that this data must have provided Malvern insight

7  to determining "financial feasability for pursuing new product or

8  market opportunities" because Malvern later entered the market.

9  Opp'n at 9.

10      The Court cannot find that Plaintiff's showing raises a

11  genuine issue of material fact as to use.  In particular, much of

12  Plaintiff's evidence of Defendants' access is submitted without a

13  factual foundation.  The remaining evidence – that the employees

14  had access to this information while at Wyatt and that Malvern

15  later entered the market – is not sufficient to support use of the

16  information except in a completely speculative manner.  The Court

17  therefore grants summary judgment as to the financial information.

18          4.  Confidential Information Relating to Technical

19              Processes

20      In the category of "technical processes," Plaintiff identifies

21  its trade secrets as "[d]etailed technical procedures and processes

22  associated with design, manufacturing, quality control, etc., of

23  the DynaPro."  Ratner Decl., Ex. 3 at 32; see id., Ex. 7.[27]  For

24  _____

25      [26]A copy of the contents of the CD are also attached as
    Exhibit 7 of the Frisenda Declaration.  Frisenda Decl. ¶ 8.
26  Plaintiff has not pointed the Court to any specific financial data
    contained in that Exhibit, and the Court did not identify any in
27  its own review.  See also Note 23, supra.

28      [27]It appears that Plaintiff alternatively defined this
                                              (continued...)

41

1   example, Plaintiff claims that Protein Solutions had pre-shipping

2   quality assurance testing processes in which the former Protein

3   Solutions' employees were involved or of which they had knowledge.

4   Ratner Decl., Ex. 7.  Through the information contained on the

5   Mattison CD-ROM, the Court finds that Plaintiff has submitted

6   sufficient evidence to establish a genuine issue of material fact

7   as to these issues.  Although the Court notes that this evidence

8   does not appear to make a specific connection between the

9   possession of this information and use, the Court finds that the

10  evidence could support reasonable inferences in Plaintiff's favor

11  that would establish this information.[28]

12          5.   Confidential Information Relating to Marketing and

13               Distribution Agreements

14      Plaintiff also claims that Defendants misappropriated

15  marketing and distribution agreements, which Plaintiff defines as

16  "past and present agreements between Proterion and their

17  distributors for international marketing and selling of the DynaPro

18  which includes unit volumes; prices; transfer prices (discounts)."

19  _____

20      [27](...continued)
    category of trade secrets as:

21      Detailed schedules defining courses of action and their
22      priorities related to the implementation of new products and
        features, typically based upon customer preferences, for the
23      purpose of generating revenue growth or maintaining market
        share; software and firmware relating to the Dynapro
24      instruments and upgrades.

25  Ratner Decl., Ex. 15 at 236.  Plaintiff's Opposition appears to
    address both definitions of this category.

26      [28]The Court notes that Defendants object to Exhibit 7 of the
27  Frisenda Declaration on a number of grounds.  See Defs.' Objections
    at 165.  The Court declines to strike the Exhibit.  As discussed in
28  Note 23, however, the discussion of the contents of the exhibit is
    limited.

1  Ratner Decl., Ex. 3 at 33.  Defendant argues that Plaintiff has no

2  evidence that Defendants used the information.  In support of their

3  arguments, Defendants have submitted the Declarations of Mattison,

4  Dolak, and Nobbmann, who have testified that they did not use the

5  information.  In Opposition to the Motion, Plaintiff relies on

6  access to the information while the three employees were at

7  Proterion.  Collins Decl. ¶¶ 42-44.  Additionally, Plaintiff

8  suggests that Defendants' CD-ROM contains a proprietary agreement.

9  Non-Copyright SGI ¶ 64 (citing Collins Decl. ¶ 45 & Frisenda Decl.,

10 Ex. 6).  On this point, the Collins Declaration lacks foundation

11 and does not attach the CD, and the Court did not find the

12 particular relevant information in its review of Exhibits 6 and 7

13 of the Frisenda Declaration.  In this situation, moreover, former

14 access to agreements, without more, raises no inference of

15 subsequent use.  As far as the Court can tell, Plaintiff has not

16 provided evidence supporting examples of how it proposes Defendants

17 used this information.  Accordingly, the Court grants summary

18 judgment as to this issue.

19          6.   Confidential Information Relating to Protein

20               Solutions' Strategies and Plans as to the Pricing of

21               Goods Sold

22      Plaintiff claims that Defendants misappropriated information

23 related to strategies and plans regarding pricing of goods.  In

24 particular, Plaintiff identifies as comprising the trade secret:

25 "[k]nowledge of product prices and underlying strategies and

26 tactics, as well as understanding gross profit margins which may

27 determine lowest selling price."  Ratner Decl., Ex. 3 at 35; id.

28

43

1  Ex. 10.  Defendants move for summary judgment on a number of
2  grounds.

3      First, Defendants argue that information as to pricing does
4  not constitute a trade secret because it is not "secret" and
5  because Plaintiff does not derive independent economic value from
6  it.  See Cal. Civ. Code § 3246.1(d).  In the same vein, Defendants
7  note that Plaintiff did not use Protein Solutions' pricing
8  strategy, which suggests that Plaintiff derived limited economic
9  advantage from it.  Ratner Decl., Ex. 24 (Clifford Wyatt Depo.) at
10 553-55.  Defendants submit evidence that Plaintiff "do[es] not, in
11 general, compete on a price basis; we compete on a basis of
12 quality."  Ratner Decl., Ex. 26 (Philip Wyatt Depo.) at 652.  In
13 fact, Philip Wyatt testified at his deposition that Wyatt's "prices
14 are not intended to be competitive.  They're often the highest
15 prices in the field, but that goes with the best products[.]"  Id.
16 at 653.  Additionally, Defendants have submitted evidence that
17 Protein Solutions customers disclosed competitors' quoted prices to
18 competitors.  Ratner Decl., Ex. 22 (Collins Depo.) at 536-37; id.,
19 Ex. 24 (Clifford Wyatt Depo.) at 553.  Moreover, Defendants submit
20 evidence that Plaintiff does not place any confidentiality
21 restrictions on its customers.  Ratner Decl., Ex. 26 (Philip Wyatt
22 Depo.) at 644-45 (Q: "Is there a reverse, a circumstance under
23 which Wyatt would ask the customer to sign a confidentiality
24 agreement to protect any information provided by Wyatt?" A: "I
25 don't think so."); id. at 654:16-25).

26     Defendants also argue that there is no evidence that
27 Defendants used any information about pricing strategy and profit
28 margins.  In particular, Defendants note that it is undisputed that

1  the former Proterion employees did not control pricing at Malvern.

2  Non-Copyright Reply SUF ¶ 26.

3      Plaintiff does not submit evidence refuting any of this

4  information.  Rather, it argues that prices are not the entirety of

5  the alleged trade secret; rather, it further encompasses

6  "strategies" and an understanding of profit margins.  Plaintiff

7  points to (1) a conclusory suggestion of access in the bidding

8  process for Proterion and (2) a conclusory statement that, at

9  Protein Solutions, "Dolak was involved in discussion regarding

10 product model pricing[] [and] Nobbman was aware of distributor

11 pricing[.]"  Collins Decl. ¶ 46.

12     The Court finds no genuine issue of material fact as to trade

13 secret misappropriation of pricing information.  The undisputed

14 facts show that actual prices were not secret, Wyatt did not use

15 Protein Solutions' pricing strategy, and the former employees did

16 not disclose any information they may have known to Malvern.

17 Additionally, Plaintiff's only evidence purportedly refuting these

18 facts is too conclusory to raise a genuine issue in the face of

19 Defendants' detailed evidence.  See F.T.C. v. Publ'g Clearing

20 House, Inc., 104 F.3d 1168, 1171 (9th Cir. 1997)("A conclusory,

21 self-serving affidavit, lacking detailed facts and any supporting

22 evidence, is insufficient to create a genuine issue of material

23 fact.").  The Court therefore grants summary judgment as to this

24 issue.

25         7.   Marketing and Product Plans and Strategies

26     Plaintiff claims that Defendants misappropriated marketing and

27 product plans and strategies.  Specifically, Plaintiff describes

28 the alleged trade secret as "[d]etailed marketing and promotion

45

1  plans and strategies contemplated or implemented for the successful

2  generation of revenue and profile; for creating and dominating a

3  market segment."  Ratner Decl., Ex. 1 at 37.  It "[i]ncludes

4  detailed information on the trade shows attended as well as

5  detailed website design and other advertising including direct mail

6  as part of the integrated marketing plan."  Id.  Plaintiff points

7  to web advertising (including the identification of top search

8  terms like "dynamic light scattering") and trade shows as

9  confidential marketing strategies.  Through the Collins

10 Declaration, Plaintiff explains that Dolak was webmaster at Protein

11 Solutions and therefore knew the key search terms, which he later

12 used to direct traffic to the Malvern site and his site.  Collins

13 Decl. ¶¶ 54-56.

14      Defendants move for summary judgment on the basis that none of

15 the strategies identified are secret.  Participation in an industry

16 conference is an inherently public approach, even if Malvern only

17 attended after it hired Dolak.  Additionally, relevant search terms

18 of the light scattering industry and other keywords are publicly

19 disclosed and publicly accessible.  See Ratner Decl., Ex. 26

20 (Philip Wyatt Depo.) at 617 (website is public), 640-41 (other

21 competitors use the phrase "dynamic light scattering" on their

22 websites); id. at Ex. 12 at 141 (Google search showing that other

23 competitors also advertise through keywords identified by

24 Plaintiff).  The Court agrees with Defendants that such strategies

25 cannot be considered trade secrets as a matter of law.  As

26 Plaintiff has not identified any further allegations or evidence

27 supporting this trade secret claim, the Court grants summary

28 judgment on this claim.

8.   <u>Knowledge of Customer Preferences</u>

Plaintiff claims that Defendants misappropriated trade secrets related to customer preference.  Plaintiff defines the trade secret as constituting "[d]etailed feedback via information gathered from the field sales and support team, as well as by confidential market surveys, providing a better understanding of customer needs and requirements."  Ratner Decl., Ex. 3 at 38.  According to Plaintiff, "[t]hese data are utilized to produce new products, software, support materials, etc. for the purpose of capturing and maintaining market share vis-a-vis a stronger competitive position."  <u>Id.</u>

Defendant moves for summary judgment on two basic grounds.  First, Defendant argues that customer preferences do not constitute a trade secret for Plaintiff because customers can and do disclose information relating to their own preferences and requirements.  The Court is not convinced that summary judgment is appropriate on the basis of this argument.  The compilation of this data could be considered a trade secret.  Defendants' cited authorities address these issues under a different standard.

Second, Defendant argues that Plaintiff has not presented evidence establishing a genuine issue of material fact as to "use."  Plaintiff bases its claim on (1) Dolak's former position with Protein Solutions, which included sales and marketing and helping to design the questionnaires; (2) the fact that the ZetaSizer Nano and its software incorporate similar features as the DynaPro based on customer preferences; and (3) the fact that customer preference information was contained on Dr. Mattison's CD-ROM and had information such as a design for a Japanese customer that was later

47

1  incorporated in the Malvern ZetaSizer Nano.[29]  Although the Court

2  agrees with Defendants that the evidence of actual use is perhaps

3  weak, the Court finds that it is sufficient to create a genuine

4  issue of material fact and declines to grant summary judgment on

5  this issue.

6          9.  <u>Planned Changes in Products</u>

7       Plaintiff also claims that Defendants misappropriated trade

8  secrets regarding planned product changes.  Plaintiff defines the

9  trade secret as embodied in "[d]etailed schedules defining courses

10 of action and their priorities related to the implementation of new

11 products and features, typically based upon customer preferences,

12 for the purpose of generating revenue growth or maintaining market

13 share."  <u>Id.</u> at 39.[30]

14      Defendants specifically address four products Plaintiff

15 appears to claim were misappropriated trade secrets.  With respect

16 to Protein Solutions' purported plans to develop a plate sampler

17 and prototype for a plate reader, the Court finds that there is no

18 triable issue as to that product.  <u>See</u> Non-Copyright Mot. at 18,

19 19; Non-Copyright Reply SUF ¶¶ 30, 34, 35.  The Court finds that

20 summary judgment is warranted as to Protein Solutions' cuvette

21 information because Plaintiff has not submitted evidence

22 establishing a triable issue.  <u>See id.</u> at 19; Non-Copyright Reply

23 _____

24      [29]Plaintiff's general citations are unhelpful.  On the Court's

25 review of the information contained in the Mattison CD-ROM,
   however, at least a few customer requests and preferences are

26 specifically listed.  <u>E.g.</u>, Frisenda Decl., Ex. 7 at 129.

27      [30]  Plaintiff specifically points to a task list that
   identified planned features for the software, though the Court did

28 not find the actual document in Plaintiff's submissions.  <u>See</u>
   Collins Decl. ¶ 61; Defs.' Objections at 108.

1   SUF ¶ 29.  With respect to the Protein Solutions' Software, the
2   Court finds that there are genuine issues of material fact, in
3   light of Plaintiff's argument regarding the solvent builder.
4   Although Plaintiff's inferential steps may not ultimately be
5   convincing, it is not the Court's role to weigh evidence.  To the
6   extent Defendants move on *other* portions of the software, the Court
7   agrees that there is no genuine issue of material fact.  With
8   respect to the Protein Solutions' Bias Adaptor, the Court also
9   finds that Plaintiff has not presented any evidence establishing a
10  genuine issue of material fact.

11       Thus, the Court grants in part and denies in part this portion
12  of the Motion.

13            10.  <u>Confidential Information Relating to Types and</u>
14                 <u>Volumes of Products Sold to Customers</u>

15       Plaintiff also claims that Defendants misappropriated
16  confidential information regarding types and volumes of products
17  sold to customers.  Plaintiff defines this trade secret as
18  "[h]istorical data showing the unit and dollar sales volume for
19  each product, model, accessory, etc."  Ratner Decl., Ex. 3 at 25.
20  Relying on the declarations of the former Proterion employees now
21  working for Malvern, Defendant argues that this claim fails because
22  those defendants did not use or disclose information in this
23  category after their employment with Protein Solutions ended.  Non-
24  Copyright Mot. at 20.  Although Plaintiff does not separately
25  address this claim, because the Court finds that evidence going to
26  this claim is largely coextensive with evidence going to the
27  customer database claims, the Court finds summary judgment
28  inappropriate.

1          11.   <u>Confidential Information Relating to Research</u>

2                <u>Development, Manufacturing, Suppliers, and</u>

3                <u>Distributors</u>

4          Plaintiff also claims that Defendants misappropriated

5    confidential information relating to research and development,

6    manufacturing, suppliers, and distributors.  Plaintiff defines this

7    category as "[d]etailed knowledge of R&D projects; manufacturing

8    bills of materials (i.e., parts required to make the product);

9    suppliers of certain components as well as the detailed

10   specifications of these components which are not always published;

11   historical quality control issues, distributors and their

12   strategies."  Ratner Decl., Ex. 3 at 32.

13         With respect to misappropriation of R&D projects and

14   software/firmware issues, the Court grants in significant part and

15   denies in small part the motion as described above in subsection

16   III(B)(9).  <u>See</u> Ratner Decl., Ex. 26 (Philip Wyatt Depo.) at

17   662:17-25.  Defendants otherwise move for summary judgment on the

18   ground that the employees claim they did not use or disclose any of

19   this information after their employment ended.  With respect to any

20   remaining claims, the Court finds that Plaintiff has presented no

21   triable issue of material fact as to this information.  <u>See</u> Non-

22   Copyright Opp'n at 9-10; Collins Decl. ¶¶ 33-34.

23         12.   <u>Summary</u>

24         Thus, the Court grants in part and denies in part the motion

25   with respect to Plaintiff's trade secret claim.  The Court grants

26   summary judgment with respect to financial data, marketing and

27   distribution agreements, pricing information, marketing and product

28   plans and strategies, and R&D.  The Court grants in part and denies

1  in part summary judgment with respect to product development.  The

2  Court denies the motion with respect to customer database

3  information, technical processes, customer preferences, and volume

4  and types of sales to customers.

5  **C.   Twelfth Claim for Relief: Intentional Interference with**

6  **Economic Advantage**

7  Defendants next move for summary judgment on Plaintiff's claim

8  for intentional interference with economic advantage.  SAC ¶¶ 174-

9  79.  To succeed on a claim for tortious interference with

10  prospective economic advantage, a plaintiff must establish the

11  following elements: (1) the existence of a specific economic

12  relationship between the plaintiff and third parties that may

13  economically benefit the plaintiff; (2) knowledge by the defendants

14  of that relationship; (3) intentional acts by the defendants

15  designed to disrupt the relationship; (4) actual disruption of the

16  relationship; and (5) damages to the plaintiffs.  Rickards v.

17  Canine Eye Registration Found., Inc., 704 F.2d 1449, 1456 (9th Cir.

18  1983).  The tort "initially requir[es] proof the business

19  relationship contained the probability of future economic

20  relationship"--the tort is inapplicable to "hypothetical

21  relationships" not developed at the time of the allegedly tortious

22  acts.  Westside Center Assoc. v. Safeway Stores 23, Inc., 42 Cal.

23  App. 4th 507, 522 (1996) (it must be "reasonably probable that the

24  prospective economic advantage would have been realized but for

25  defendant's interference").  Additionally, a plaintiff must prove

26  that the defendants' interference with prospective economic

27  relations "was wrongful 'by some other measure beyond the fact of

28  interference itself.'"  Silicon Knights, Inc. v. Crystal Dynamics,

1  <u>Inc.</u>, 983 F. Supp. 1303, 1311 (N.D. Cal. 1997) (quoting <u>Della Penna</u>

2  <u>v. Toyota Motor Sales, U.S.A., Inc.</u>, 11 Cal. 4th 376, 393 (1995)).

3        Defendants first argue that Plaintiff has no evidence of a

4  "reasonably probable future economic benefit" from the customers it

5  identifies.  Defendants have submitted evidence in the form of

6  deposition testimony from various Wyatt employees discussing

7  current and potential clients, obtaining business, and competitors

8  in the industry.  <u>See</u> Non-Copyright SUF ¶ 37.  Plaintiff has

9  submitted no evidence addressing a reasonably probable future

10 benefit,[31] though some of the evidence submitted by Defendants

11 could be read in Plaintiff's favor to explain why customers would

12 be better suited to choose either Malvern or Wyatt products.  As

13 Plaintiff's evidence addresses no specific relationship with any

14 specific customer and consists entirely of general statements,

15 Plaintiff's evidence does not create a genuine issue of material

16 fact as to why Plaintiff had a "reasonably probable future economic

17 benefit" from any of them, as opposed to simply competing for

18 business with competitors.[32]  Accordingly, the Court grants

19 _____

20        [31]The cited paragraphs of the various declarations referenced
   in both the Non-Copyright SGI and the Non-Copyright Opposition do
21 not address whether there was a "reasonable probability of future
   economic benefit" from various potential customers.

22        [32]Plaintiff's entire argument on this point can be quoted as
23 follows:

24        Wyatt has set forth evidence of its anticipated sales of its
          DynaPro product line through repeat sales to its existing and
25        potential customers.  These sales include sales of future
          products, service contracts and, [sic] convoy sales, as well
26        as sales of its next generation (versions)of such instruments.
          See Declaration of Geof Wyatt 3 through 13 and 25-29. . . .
27        Wyatt has proffered evidence that Malvern has intentionally
          interfered with its expectation of revenue from existing and
28        future customers. This revenue comes from maintenance
                                                    (continued...)

                                    52

1  Defendants' motion on this ground.  The Court need not address
2  Defendants' alternative argument that Plaintiff cannot demonstrate
3  that Malvern engaged in an independently wrongful act.  <u>See</u> Mot. at
4  23-24.

5      **D.    Thirteenth Claim for Relief: California's Unfair**
6          **Competition Law**

7      Defendants also move for summary judgment on Plaintiff's
8  Thirteenth Claim, which seeks recovery under California's unfair
9  competition law, California Business and Professions Code §§ 17200,
10 17500 ("UCL").  As Defendants explain, Plaintiff's UCL claim is
11 derived from its other claims – the Lanham Act, trade secret
12 misappropriation, etc.  Because the Court has not considered the
13 merits of Plaintiff's Lanham Act claim (which was not raised in
14 Defendants' Motion), the Court finds summary judgment inappropriate
15 on this claim.

16     **E.    Fourteenth Claim for Relief: Accounting**

17     Because accounting can be an appropriate part of a plaintiff's
18 remedy in Lanham Act cases, <u>see</u> <u>Healthport Corp. v. Tanita Corp. of</u>
19 <u>Am.</u>, 563 F. Supp. 2d 1169, 1182 (D. Or. 2008), the Court denies
20 Defendants' Motion on this ground.

21     **F.    Summary**

22     Thus, the Court grants in part and denies in part the Non-
23 Copyright Motion for Summary Judgment.

24 **V.   CONCLUSION**

25 _____

26     [32](...continued)
   contracts and renewals, new customer sales and sales of future
27 and convoyed products.

28 Non-Copyright Opp'n at 22, 23.  As mentioned above, the Court sees
   no specifics in the cited evidence.

1        For the foregoing reasons, the Court grants in part and denies

2   in part the motions.   The Court denies Plaintiff's Rule 56(f)

3   request.   The Court grants in significant part the Copyright

4   Motion, and grants in part and denies in part the Non-Copyright

5   Motion.   Where the Court denies Defendants' Motions, it does so

6   without prejudice.

7   IT IS SO ORDERED.

8

9

10  Dated: July 29, 2009

                                        DEAN D. PREGERSON
11                                      United States District Judge

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28